SCOTT N. SCHOOLS, SC SBN 9990
United States Attorney
JOANN M. SWANSON, CSBN 88143
Assistant United States Attorney
Chief, Civil Division
ILA C. DEISS, NY SBN 3052909
Assistant United States Attorney

450 Golden Gate Avenue, Box 36055
San Francisco, California 94102
Telephone: (415) 436-7124
FAX: (415) 436-7169

Attorneys for Defendants

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| SHIA ASSOCIATIONS OF BAY AREA, INC.; et al., <br><br> Plaintiffs, <br><br> v. <br><br> MICHAEL CHERTOFF, Secretary of the Department of Homeland Security; et al., <br><br> Defendants. | No. C 07-3328 JW <br><br> **DECLARATION OF ILA C. DEISS IN SUPPORT OF DEFENDANTS' OPPOSITION TO PLAINTIFF'S MOTION FOR A PRELIMINARY INJUNCTION AND RESPONSE TO THE COURT'S ORDER TO SHOW CAUSE** <br><br> Hearing Date: July 30, 2007 <br> Time: 9:00 a.m. |

Pursuant to Local Rule 7-5 and 28 U.S.C. § 1746, I, Ila C. Deiss, declare as follows:

1. I am employed as an Assistant United States Attorney for the Northern District of California and have been assigned to *Shi'a Association of the Bay Area; et al. v. Chertoff*, C 05-4218 MMC. As such, I have personal knowledge of the following facts and could testify regarding these facts if called to do so.

2. Attached as Exhibit A is a true and correct copy of USCIS's July 25, 2007 denial of Plaintiffs' remanded Form I-360 petition, and certification to the Administrative Appeal Office, dated July 25, 2007.

3. Attached as Exhibit B is a true and correct copy of Department of States July 2007 Visa Bulletin.

Declaration of Ila C. Deiss
C07-3328 JW                                           1

1  I declare under penalty of perjury that the foregoing is true and correct and that this declaration
2  was executed under the laws of the United States on this 27th day of July 2007, in San Francisco,
3  California.

          _____
          ILA C. DEISS

Declaration of Ila C. Deiss
C07-3328 JW                                2

Exhibit A

TO: Shia Association of Bay Area Inc
C/O: Sajjad Mir
4415 Fortran Court
San Jose, CA 95134

File number: WAC-05-134-52734

Date: July 25, 2007

**IN THE MATTER OF:**
Form: I-360 Petition for Amerasian, Widow(er) or Special Immigrant

The following action has been taken in this case:

1. ☐ This case has been certified for review to the Board of Immigration Appeals (Board). Within 10 days after receipt of this notice, you may submit to this office a brief or written statement for the Board to consider. If you desire oral argument before the Board, you must send a prompt request by letter to the Board at 5107 Leesburg Pike, Suite 2400, Falls Church, Virginia 22041.

2. ☐ In accordance with 8 CFR 245.13(m)(2) or 8CFR 245.15(r)(3), this case has been certified for review to the Immigration Court located at _____ so that an immigration judge may conduct a hearing to determine whether this decision should be made final. Within 10 days after receipt of this notice, you may submit to this office a brief or written statement for the Court to consider. Regardless of whether you submit a brief, you will be notified by the Immigration Court of the date, time and location of the hearing.

3. ■ This case has been certified for review to:

   A. ■ The Administrative Appeals Unit (AAU), U.S. Citizenship and Immigration Services, 20 Massachusetts Avenue, Washington, DC 20536.

   B. ☐ The following Service official:

       Located at:

Within 30 days of this notice, you may submit **to the office where your case was sent**, a brief or written statement. Any request for oral argument before the AAU must be made within the 30-day period. If you want, you may waive the 30-day period by writing to the office where your case was sent.

*[signature]*

Director
California Service Center

cc: Jill Stanton, Esq.

Form I-290C (02 01-99)N

WAC0513452734
Page 2

The petitioner, Shia Association of Bay Area, Inc. (SABA Inc.), has filed Form I-360, Petition for Amerasian, Widow or Special Immigrant, pursuant to section 203(b)(4) of the Immigration and Nationality Act, seeking classification of the beneficiary, Nabi Raza Mir, as a section 101(a)(27)(C) special immigrant religious worker.

On December 29, 2006, our office denied the petition. The petitioner filed an appeal on January 30, 2007, which was forwarded to the Administrative Appeals Office (AAO). On June 14, 2007, the AAO remanded the petition back to our office for further consideration.

Classification of the beneficiary as a special immigrant religious worker requires that the prospective employer demonstrate that a qualifying job offer has been tendered.

8 C.F.R. 204.5(m)(4) states, in pertinent part, that:

> Job Offer. The letter from the authorized official of the religious organization in the United States must state how the alien will be solely carrying on the vocation of a minister, or how the alien will be paid or remunerated if the alien will work in a professional capacity or in other religious work. The documentation should clearly indicate that the the alien will not be solely dependent on supplemental employment or solicitation of funds for support...

The record reflects that the petitioner initially indicated during the application process that the beneficiary will be paid $2,000 [recently increased $2,500] as his monthly salary and would be provided with a suitable housing accommodation and health benefits as remuneration for his religious work. The petitioner provided a lease agreement entered into between the beneficiary and the petitioner for a sublet commencing on February 1, 2003 and ending on January 31, 2005 for a "3 bedroom house" in San Jose with no address provided. The agreement does not reflect that the accommodation was provided free of charge as part of the beneficiary's remuneration, but rather requires payment by the beneficiary of $1,200 rent per month in addition to a $1,000 security deposit. There is no written provision in the lease agreement or in a separate agreement between the petitioner and the beneficiary for the rent payments to be waived in exchange for the beneficiary's services as part of the petitioner's remuneration to the beneficiary.

On appeal, the petitioner argued that in addition to his current salary of $2,500, the beneficiary receives a monthly housing allowance in the amount of $1,750. However, the amount of $1,750 for a housing allowance conflicts with the previously submitted lease agreement which indicates that the beneficiary was obligated to pay the petitioner $1,200 rent per month. Moreover, with the appeal, the petitioner submitted copies of several monthly checks in the amount of $1,715 from the petitioner payable to an individual named "Ali Khan." The name of Ali Khan does not appear anywhere on the February 2003 lease agreement between the petitioner and the beneficiary. Four of the checks submitted by the petitioner fall within the two-year period immediately preceding the filing of the petition (April 11, 2003-April 11, 2005). However, these checks contain no mention of the beneficiary or any indication that they were paid as part of the beneficiary's remuneration.

In connection with the AAO remand, our office issued a Request for Additional Evidence (RFE) on July 2, 2007. In response to the Request for Additional Evidence our office received on July 16, 2007 a letter dated July 11, 2007, from Attorney Jill Stanton with the following attachments:

    A.    Undated letter from Murtuza Rizvi, Treasurer and member of BOD of SABA Inc.
    B.    August 5, 2002 California Residential Lease Agreement between Mir R. Ali Khan and SABA, Inc.
    C.    July 11, 2007 letter from Mir R. Ali Khan

ATTACHMENT TO I-292

WAC0513452734
Page 3

    D.      Undated listing of checks issued by SABA Inc. to Mr. Khan purportedly for lease payments for residential property occupied by the beneficiary and his family.
    E.      Copy of Page 8 of IRS Publication 517.

The RFE requested the petitioner submit, among other items, evidence that the petitioner provided and paid for the beneficiary's housing from April 11, 2003 until April 11, 2005.

In response, the undated Rizvi letter explains the beneficiary's housing allowance as follows:

> "In the two years beginning April 2003 through April 2005, SABA Inc., paid the property owner at 94 South Gate San Jose, $1715 a month of which $1200 was attributable to residential housing allowance provided to Dr. Mir and his family as part of his compensation package."

In addition, the petitioner provided an earlier, month to month lease agreement from August 2002 for a property located at 94 Southgate Court, San Jose, California, 95148. This lease contains the name of Ali Khan as the "landlord" and SABA, Inc. as the "tenant." Contained within this lease is an agreement for SABA Inc. to pay Mr. Khan $1,715 a month in exchange for the beneficiary and his family to have use of the premises. Despite previous requests for evidence regarding the remuneration paid to the beneficiary, this is the first time the petitioner is submitting this lease supposedly executed on August 5, 2002, which purports to establish that SABA Inc. paid Mr. Khan for the use of the premises by the beneficiary and his family.

Additionally, the petitioner submitted the following list of checks purportedly issued to Mr. Khan to lease a premise to be occupied by the beneficiary:

| Date | Check# | Amount |
| --- | --- | --- |
| 2/6/03 | 3719 | $1715 |
| 2/20/03 | 3729 | $1715 |
| 4/3/03 | 3762 | $1715 |
| 5/2/03 | 3777 | $1715 |
| 6/1/03 | 3791 | $1715 |
| 7/3/03 | 3802 | $1715 |
| 8/1/03 | 3813 | $1715 |
| 9/4/03 | 3826 | $1715 |
| 10-12/03 | Check # requested | 3X$1715 |
| 1/9/04 | 3884 | $1715 |
| 2/12/04 | 3895 | $1715 |
| 3/20/04 | 3293 | $1715 |
| 4/2/004 | 3946 | $1715 |

Significantly, however, in a written statement dated December 16, 2006, the beneficiary stated that he receives a monthly housing allowance in the amount of $1,750, not $1,715, as evidenced by the list of checks:

> Since in my arrival in the United States, my only source of income is my employer, [the petitioner].
>
> I have not received any gifts over $500.00 in value from [the petitioner] other than my present monthly salary in the amount of $2,500, monthly housing allowance in the amount of $1,750.00 and medical health plan premiums in the amount of $8,499.00 annually.

ATTACHMENT TO I-292

WAC0513452734
Page 4

> I have not received any income from any other source since my arrival in the United States in 2002.

For the reasons explained below, the additional documentation submitted by the petitioner has failed to reconcile the inconsistencies in the record regarding the beneficiary's compensation. Significantly, the petitioner has claimed that it provides the beneficiary a housing allowance, and in the beneficiary's December 16, 2006 statement, he specified this amount was $1,750 per month. However, the August 2002 lease purports to establish that the petitioner pays Mr. Khan $1,715 in exchange for allowing the beneficiary and his family to live at the residence located at 94 Southgate Court, San Jose, CA. Moreover, the claimed amount of $1750 for the beneficiary's housing allowance conflicts with the amount of $1,715 purportedly paid to Mr. Khan [the apparent property owner] as evidenced by the list of checks and the Rizvi letter.

The February 2003 lease between the petitioner and the beneficiary purports to establish that the beneficiary agreed to pay the petitioner $1,200 monthly to sublet a "3 bedroom house" in San Jose, and does not include a waiver of the rent payments as part of the beneficiary's remuneration. Therefore, this lease fails to substantiate the petitioner's statements that housing is provided to the beneficiary as part of his compensation. The two leases read together only show that SABA Inc. agreed to pay Mr. Khan $1,715 a month for the beneficiary to have use of the premises at 94 Southgate Court, and that the beneficiary has a separate obligation as a sub-lessee to pay SABA, Inc. in the amount of $1,200 per month for the use of a "3 bedroom house", address unknown, as well as a $1,000 security deposit. The two leases provide no evidence establishing that the petitioner waived the beneficiary's rental payment obligations or continues itself to pay the monthly rent to Mr. Khan, as part of the beneficiary's compensation package. Moreover, it is not clear that the two leases even refer to the same property because of the unusual, vague description of the real property in the February 2003 lease as a "3 bedroom house." The uncertain nature of this description calls into question the legitimacy of the lease. The inconsistencies serve to undermine the credibility of the petitioner's claim that it provides a housing allowance to the beneficiary. In addition to contradicting the contemporaneous documentary evidence of the leases, the petitioner's and the beneficiary's statements regarding the amount of the housing allowance are also internally inconsistent.

In addition, the beneficiary's December 16, 2006 claim of a housing allotment of $1,750 per month contradicts the February 2003 lease amount of $1,200 per month. The claimed amount of $1,750 conflicts with the claimed amount of $1,715 shown in the list of checks purportedly written to pay the beneficiary's housing submitted by the petitioner. Finally, there is additional conflicting information regarding the amount of the housing allowance contained in the tax returns. For example, in two places on the 2004 tax returns (Form W-2 Additional Wage and Tax information and the Schedule SE Adjustments Worksheet), the beneficiary indicated that he received a total of $14,400 for a housing allowance, which breaks down to $1,200 a month and not $1,750 a month. The petitioner's and beneficiary's statements and the leases submitted by the petitioner fail to establish the petitioner has provided and paid for the beneficiary's housing.

The only evidence related to income that has been consistent is the $2,500 monthly salary which the beneficiary claims. Assuming this is the beneficiary's only verifiable income, it is difficult to understand how a monthly salary of $2,500 is sufficient to support a family of five in the Bay Area. This additional factor also leads USCIS to conclude that petitioner has not established that that beneficiary will not be solely dependent on supplemental employment or solicitation of funds for support.

Additionally, a review of the beneficiary's federal income tax returns for 2002 through 2005 shows that each year the beneficiary filed not only an Internal Revenue Service Form 1040 return, but also schedule SE, Self-Employment Tax. Self-employment income is taxed separately from salary income, as is clear from the structure of Form 1040 and Schedule SE. The beneficiary claimed in his December 16, 2006 statement that he

WAC0513452734
Page 5

has not received any income from any other source since his arrival in the United States in 2002. The AAO noted that the beneficiary's self-prepared tax returns, however, appear to tell a different story. Those returns, including Form 1040 and Schedule SE, show the following information:

|  | 2003 | 2004 | 2005 |
|---|---|---|---|
| Wages, salaries, tips, etc. | $20,000 | $20,000 | $24,000 |
| Taxable income | 0 | 0 | 0 |
| Tax | 0 | 0 | 0 |
| Net profit (from Schedule SE) | 27,520 | 22,637 | 38,400 |
| Self-employment tax | 3,888 | 3,198 | 5,426 |

In each year, the beneficiary's "net profit" exceeded his reported salary.

Prior to the remand, the petitioner had not submitted any documentation to show the source of the beneficiary's total of $88,557 in "net profit" from self-employment during those three years. Therefore, the July 2, 2007 request for evidence was sent to the petitioner requesting, inter alia, :

> "Copies of the previously requested beneficiary's W-2s from 2003 to 2005 and documentary evidence to establish the source of this net profit ($88,557) as claimed on the beneficiary's 2003, 2004 and 2005 tax returns."

The petitioner's response included a letter from attorney Jill Stanton, in which she attempted to explain the beneficiary's additional net profit as resulting from his housing allotment. She cited the beneficiary's only sources of income from April 11, 2002 to April 11, 2005 to be "his ministerial salary and his clergy housing allowance." This contradicts the beneficiary's December 2006 statement that his only sources of income in the United States are his monthly salary, monthly housing allowance and medical health care premiums. Additionally, Ms. Stanton discussed the IRS's special tax rules for clergy as follows:

> "Under IRS's special tax rules for clergy, the qualified housing allowance provided to clergy is exempt from income tax purposes and is not reported on Form 1040 as income. However, this exemption does not apply to federal self-employment tax. On Form SE, total income subject to SE (self-employment) tax includes salary and any clergy housing allowance net of clergy expenses. It should be noted that Dr. Mir has been a full time employee of SABA, but has filed his taxes as SE, as IRS allows clergy/religious workers to do so.
>
> Although Dr. Nabi Reza Mir's aggregate salary for the three years of 2003, 2004 and 2005 was a total of $64,000; he paid self-employment tax on $88,557. Below is the breakdown of income subject to SE tax.

| Tax Filed | 2005 | 2004 | 2003 | Total |
|---|---|---|---|---|
| Salary (reported on Form 1040 as income) | 24,000 | 20,000 | 20,000 | 64,000 |
| Clergy housing allowance | 14,400 | 14,400 | 13,200 | 42,000 |
| Less clergy expenses | - | (11,763) | (5,680) | (17,443) |
| Net reported on form SE: Line 2 | $38,400 | $24,641 | $29,523 | $88,557 |

Please refer to Dr. Mir's SE forms filed with the supporting worksheet for the years 2003, 2004,

ATTACHMENT TO I-292

WAC0513452734
Page 6

and 2005, clarifying the above calculation. Also attached is a section from IRS Publication 517, explaining the exclusion of housing/rental allowance from reportable income for income tax purposes but not from income subject to self-employment tax."

IRS publication 517 indicates that "ordained, commissioned, or licensed ministers of the gospel may be able to exclude the rental allowance or fair rental value of a parsonage that is provided to them as pay for their services." However, "this exclusion applies only for income tax purposes. It does not apply for SE tax purposes as discussed earlier under Self-Employment Tax: Figuring Net Earnings." Ms. Stanton wrote that "on Form SE, total income subject to SE (self-employment) tax includes salary and any clergy housing allowance net of clergy expenses." Therefore, Ms. Stanton explained that the $88,557 total net income the beneficiary reported for the tax years 2003-2005 resulted from his total housing allotment of $42,000. Ms. Stanton wrote that "between February 2003 and April 2005, $1,200 of SABA, Inc.'s monthly rent payments was attributable to clergy housing provided without cost to Dr. Mir."

However, the contemporaneous leases do not establish that the petitioner provided a $1,200 housing allowance to the beneficiary as claimed by counsel. The claim in the undated Rizvi letter appears to be an effort to satisfy the AAO's concern that the available evidence was not sufficient to show that the petitioner has provided and paid for the beneficiary's housing. Moreover, the petitioner has submitted contradictory housing allowance amounts, namely, on the beneficiary's tax returns, he claims $14,400 (or $1,200 a month) but in his December 16, 2006 statement, he claims the amount of $21,000 (or $1,750 a month) for housing allowance. Finally, the amount of $1,750 conflicts with the amount of $1,715 purportedly paid to Mr. Khan [the apparent property owner] as evidenced by the list of checks submitted and the Rizvi letter.

Furthermore, counsel maintained that the beneficiary reported net income profit on Form SE Line 2 in 2003 and 2004 of $29,523 and $24,641, respectively, consisting of the beneficiary's salary and any clergy allowance net of clergy expenses. However, a review of the calculations made by petitioner reveals that the beneficiary's SE net profit for tax years 2003 and 2004 from his salary and clergy allowance minus clergy expenses should be $27,520 and $22,637 in 2003 and 2004 respectively, not $29,523 and $24,641. In addition, from the chart submitted by the petitioner regarding the beneficiary's income, in 2003, it appears that the beneficiary was only claiming $13,200 in housing allowances (which amounts to a $1,100 a month or $1,200 if paid only for 11 months) which is another amount inconsistent with the previously claimed $1,750 and $1,715 a month for housing allowance. A Schedule SE Adjustment Worksheet was also not submitted in connection with the 2005 tax return. Therefore, questions still remain regarding the amount of the self employment income as reported in 2003, 2004, and 2005.

In an attempt to explain the aggregate net income of $88,557 that the beneficiary reported in his SE tax returns for 2002-2005, the Rizvi letter claims that as of February 2003, when the beneficiary began occupying the premises with his family, the actual housing allowance was $1,200 per month instead of the total $1,715 rent amount. Specifically Rizvi noted "in the two years beginning April 2003 through April 2005, SABA, Inc. paid the property owner at 94 South Gate, San Jose, $1,715 a month, of which $1,200 was attributable to residential housing allowance provided to Dr. Mir and his family as part of his compensation package." According to the Khan letter dated July 11, 2007, "although the property was initially used by SABA, Inc. as office and storage space, with my knowledge and permission, Dr. Nabi Raza Mir and his family began using the majority of the premises as their residence. With the growth of Dr. Mir's family, SABA Inc. eventually permitted him to use the entire premise for his housing needs." The Stanton and Rizvi letters infer that the beneficiary took over the entire premise for his housing as of May 2005. However, the increase in his housing allowance to the full $1,715 was not reported in his 2005 tax return. This raises the issue whether the beneficiary is underreporting his income for SE tax purposes.

ATTACHMENT TO I-292

WAC0513452734
Page 7

In addition, this evidence that the beneficiary moved into the premises in February 2003 also leads us to question why the August 2002 lease with the specific use of the premises for "Dr. Nabi Raza Mir and family" was necessary six months before the beneficiary allegedly occupied the premises [assuming the leases are for the same property.] The conflicting information raises serious concerns regarding the authenticity of the supporting documentation related to the beneficiary's purported housing allowance and the location and dates of residence.

Based on the unresolved inconsistencies and conflicting information contained in the petitioner's documentation describing the beneficiary's compensation, the petitioner has not provided sufficient evidence to establish that it has provided and paid for the beneficiary's housing as claimed under the beneficiary's job offer. Therefore, the Petitioner has failed to adequately describe the claimed arrangements for the beneficiary's compensation and has failed to demonstrate a qualifying job offer. Thus, the beneficiary's net income as reported on his 2003, 2004 and 2005 tax returns still remains unsatisfactorily explained by the petitioner. Given the questions regarding the beneficiary's compensation and the relatively low salary provided to the beneficiary, the petitioner has not shown that the beneficiary will not be solely dependent on supplemental employment or solicitation of funds for support.

Moreover, the inconsistencies and conflicting information in the record related to the beneficiary's housing allotment leads us to question the credibility of the documentation as a whole submitted by the petitioner. We also question the credibility of the beneficiary and how much weight should be given his attestations based on the inconsistencies in the record here and previous questionable statements made in connection with an incident discovered during the course of our standard background checks. Specifically on July 20, 2002, the beneficiary was caught at the airport bringing $42,000 worth of diamonds into the United States without filing a customs declaration. The beneficiary stated that he obtained the diamonds on credit from Peacemoon Traders in Mumbai, India and brought them to the United States for appraisal and a certificate from the "IG" (presumably the Gemological Institute of America). In an interview of the beneficiary as part of a site visit by USCIS to SABA Inc. on December 13, 2006, the beneficiary claimed his failure to declare the diamonds upon his arrival on July 20, 2002 was a result of his "managing the import of goods (in Japan) not actually carrying them into the country." He stated he "simply was not aware," and did not think that he needed to declare the diamonds because his intent was only to have them appraised. In view of his prior employment as an import manager for a Japanese company, for a company in Dubai, his extensive international import experience and his family's involvement in the diamond business, we do not find it credible that the beneficiary would be uninformed about U.S. customs laws and export/import requirements in general. Doubt cast on any aspect of the petitioner's proof may, of course, lead to reevaluation of the reliability and sufficiency of the remaining evidence offered in support of the visa petition. Matter of Ho, 19 I&N Dec. 591 (BIA 1988).

It is incumbent upon the petitioner to resolve any inconsistencies in the record by independent objective evidence; any attempts to explain or reconcile such inconsistencies, absent competent objective evidence pointing to where the truth lies, will not suffice. Matter of Ho, 19 I&N Dec. 582 (Comm. 1988).

The burden of proof in these proceedings rests solely with the petitioner. Section 291 of the Act, 8 U.S.C. 1361. The petitioner has not sustained that burden.

Therefore, the petition to classify the beneficiary as a special immigrant religious worker is denied.

This case has been certified for review to the Administrative Appeals Office (AAO).

ATTACHMENT TO I-292

Exhibit B

# Visa Bulletin

*Number 107*
*Volume VIII*
*Washington, D.C.*

# VISA BULLETIN FOR JULY 2007

## A. STATUTORY NUMBERS

1. This bulletin summarizes the availability of immigrant numbers during July. Consular officers are required to re State documentarily qualified applicants for numerically limited visas; the Bureau of Citizenship and Immigration Department of Homeland Security reports applicants for adjustment of status. Allocations were made, to the exte numerical limitations, for the demand received by June 12th in the chronological order of the reported priority dat not be satisfied within the statutory or regulatory limits, the category or foreign state in which demand was exces oversubscribed. The cut-off date for an oversubscribed category is the priority date of the first applicant who coul the numerical limits. Only applicants who have a priority date earlier than the cut-off date may be allotted a numb becomes necessary during the monthly allocation process to retrogress a cut-off date, supplemental requests fol only if the priority date falls within the new cut-off date.

2. Section 201 of the Immigration and Nationality Act (INA) sets an annual minimum family-sponsored preference worldwide level for annual employment-based preference immigrants is at least 140,000. Section 202 prescribes for preference immigrants is set at 7% of the total annual family-sponsored and employment-based preference li dependent area limit is set at 2%, or 7,320.

3. Section 203 of the INA prescribes preference classes for allotment of immigrant visas as follows:

**FAMILY-SPONSORED PREFERENCES**

First : Unmarried Sons and Daughters of Citizens: 23,400 plus any numbers not required for fourth preference.

Second : Spouses and Children, and Unmarried Sons and Daughters of Permanent Residents: 114,200, plus the the worldwide family preference level exceeds 226,000, and any unused first preference numbers:

A. Spouses and Children: 77% of the overall second preference limitation, of which 75% are exempt from the pe

B. Unmarried Sons and Daughters (21 years of age or older): 23% of the overall second preference limitation.

Third : Married Sons and Daughters of Citizens: 23,400, plus any numbers not required by first and second prefe

Fourth : Brothers and Sisters of Adult Citizens: 65,000, plus any numbers not required by first three preferences.

**EMPLOYMENT-BASED PREFERENCES**

First : Priority Workers: 28.6% of the worldwide employment-based preference level, plus any numbers not requi preferences.

Second : Members of the Professions Holding Advanced Degrees or Persons of Exceptional Ability: 28.6% of the based preference level, plus any numbers not required by first preference.

Third : Skilled Workers, Professionals, and Other Workers: 28.6% of the worldwide level, plus any numbers not r second preferences, not more than 10,000 of which to "Other Workers".

Fourth : Certain Special Immigrants: 7.1% of the worldwide level.

Fifth : Employment Creation: 7.1% of the worldwide level, not less than 3,000 of which reserved for investors in a unemployment area, and 3,000 set aside for investors in regional centers by Sec. 610 of P.L. 102-395.

4. INA Section 203(e) provides that family-sponsored and employment-based preference visas be issued to eligi in which a petition in behalf of each has been filed. Section 203(d) provides that spouses and children of prefere entitled to the same status, and the same order of consideration, if accompanying or following to join the principa provisions of Section 202(e) apply to allocations for a foreign state or dependent area when visa demand exceec These provisions apply at present to the following oversubscribed chargeability areas: CHINA-mainland born, IN PHILIPPINES.

5. On the chart below, the listing of a date for any class indicates that the class is oversubscribed (see paragrapl i.e., numbers are available for all qualified applicants; and "U" means unavailable, i.e., no numbers are available. available only for applicants whose priority date is earlier than the cut-off date listed below.)

| Family | All Charge-ability Areas Except Those Listed | CHINA-mainland born | INDIA | MEXICO | PHILIPP-INES |
|---|---|---|---|---|---|
| 1st | 01JUL01 | 01JUL01 | 01JUL01 | 01JAN91 | 22APR92 |
| 2A | 01JUN02 | 01JUN02 | 01JUN02 | 01AUG01 | 01JUN02 |
| 2B | 08FEB98 | 08FEB98 | 08JUN98 | 08MAR92 | 01OCT96 |
| 3rd | 15JUL99 | 15JUL99 | 15JUL99 | 08FEB88 | 01JAN85 |
| 4th | 01AUG96 | 01MAR96 | 08FEB96 | 22JUL94 | 01APR85 |

*NOTE: For July, 2A numbers EXEMPT from per-country limit are available to applicants from all countries with | 01AUG01. 2A numbers SUBJECT to per-country limit are available to applicants chargeable to all countries EXC priority dates beginning 01AUG01 and earlier than 01JUN02. (All 2A numbers provided for MEXICO are exempt there are no 2A numbers for MEXICO subject to per-country limit.)

| | All Charge-ability Areas Except Those Listed | CHINA-mainland born | INDIA | MEXICO | PHILIP-PINES |
|---|---|---|---|---|---|
| Employ-ment -Based | | | | | |
| 1st | C | C | C | C | C |
| 2nd | C | C | C | C | C |
| 3rd | C | C | C | C | C |
| Other Workers | U | U | U | U | U |
| 4th | C | C | C | C | C |
| Certain Religious Workers | C | C | C | C | C |

| | | | | | |
|---|---|---|---|---|---|
| Iraqi & Afghani Translators | C | C | C | C | C |
| 5th | C | C | C | C | C |
| Targeted Employ-ment Areas/ Regional Centers | C | C | C | C | C |

The Department of State has available a recorded message with visa availability information which can be heard 1541. This recording will be updated in the middle of each month with information on cut-off dates for the followir

Employment Third Preference Other Workers Category: Section 203(e) of the NACARA, as amended by Section provides that once the Employment Third Preference Other Worker (EW) cut-off date has reached the priority da approved prior to November 19, 1997, the 10,000 EW numbers available for a fiscal year are to be reduced by u beginning in the following fiscal year. This reduction is to be made for as long as necessary to offset adjustments program. Since the EW cut-off date reached November 19, 1997 during Fiscal Year 2001, the reduction in the E began in Fiscal Year 2002.

**B. DIVERSITY IMMIGRANT (DV) CATEGORY**

Section 203(c) of the Immigration and Nationality Act provides a maximum of up to 55,000 immigrant visas each immigration opportunities for persons from countries other than the principal sources of current immigration to th Nicaraguan and Central American Relief Act (NACARA) passed by Congress in November 1997 stipulates that t for as long as necessary, up to 5,000 of the 55,000 annually-allocated diversity visas will be made available for u program. **This reduction has resulted in the DV-2007 annual limit being reduced to 50,000.** DV visas are di geographic regions. No one country can receive more than seven percent of the available diversity visas in any c

For July, immigrant numbers in the DV category are available to qualified DV-2007 applicants chargeable to all r as follows. When an allocation cut-off number is shown, visas are available only for applicants with DV regional l BELOW the specified allocation cut-off number:

| **Region** | **All DV Chargeability Areas Except Those Listed Separately** | |
|---|---|---|
| **AFRICA** | 35,500 | Except: Egypt: 22,600 Ethiopia: 22,900 Nigeria: 16,150 |
| **ASIA** | 7,750 | |
| **EUROPE** | 23,000 | Except: Ukraine 13,000 |
| **NORTH AMERICA (BAHAMAS)** | 12 | |
| | | |

| | | |
|---|---|---|
| OCEANIA | 1,800 | |
| SOUTH AMERICA, and the CARIBBEAN | 2,500 | |

Entitlement to immigrant status in the DV category lasts only through the end of the fiscal (visa) year for which th the lottery. The year of entitlement for all applicants registered for the DV-2007 program ends as of September 3 be issued to DV-2007 applicants after that date. Similarly, spouses and children accompanying or following to joi only entitled to derivative DV status until September 30, 2007. DV visa availability through the very end of FY-20 granted. Numbers could be exhausted prior to September 30.

### C. ADVANCE NOTIFICATION OF THE DIVERSITY (DV) IMMIGRANT CATEGORY RANK CUT-OFFS WHICH AUGUST

For August, immigrant numbers in the DV category are available to qualified DV-2007 applicants chargeable to a countries as follows. When an allocation cut-off number is shown, visas are available only for applicants with DV numbers BELOW the specified allocation cut-off number:

| Region | All DV Chargeability Areas Except Those Listed Separately | |
|---|---|---|
| AFRICA | CURRENT | Except: Egypt: 22,600 Ethiopia 16,000 Nigeria 18,700 |
| ASIA | CURRENT | Except: Bangladesh 8,150 |
| EUROPE | CURRENT | Except: Ukraine 13,700 |
| NORTH AMERICA (BAHAMAS) | CURRENT | |
| OCEANIA | CURRENT | |
| SOUTH AMERICA, and the CARIBBEAN | CURRENT | |

### D. EMPLOYMENT THIRD PREFERENCE "OTHER WORKER" CATEGORY

The few remaining "Other Worker" numbers which were available for allocation were all used and the 5,000 annu reached during the month of June. It has therefore been necessary to make the Employment Third preference "C "Unavailable" for July, and it will remain so for the remainder of the fiscal year.

### E. EMPLOYMENT-BASED VISA AVAILABILITY DURING THE COMING MONTHS

All Employment Preference categories except for Third "Other Workers" have been made "Current" for July. This effort to generate increased demand by Citizenship and Immigration Services (CIS) for adjustment of status case

number use under the annual numerical limit. However, all readers should be alert to the possibility that not all E
will remain Current for the remainder of the fiscal year. Should the rate of demand for numbers be very heavy in
could become necessary to retrogress some cut-off dates for September, most likely for China-mainland born an
for Mexico and Philippines. Severe cut-off date retrogressions are likely to occur early in FY-2008.

### F. OBTAINING THE MONTHLY VISA BULLETIN

The Department of State's Bureau of Consular Affairs offers the monthly "Visa Bulletin" on the INTERNET'S WO
INTERNET Web address to access the Bulletin is:

> http://travel.state.gov

From the home page, select the VISA section which contains the Visa Bulletin.

To be placed on the Department of State's E-mail subscription list for the "Visa Bulletin", please send an E-mail t
address:

> **listserv@calist.state.gov**

and in the message body type:
**Subscribe Visa-Bulletin *First name/Last name***
*(example: Subscribe Visa-Bulletin Sally Doe)*

To be removed from the Department of State's E-mail subscription list for the "Visa Bulletin", send an e-mail mes
mail address :

> **listserv@calist.state.gov**

and in the message body type: **Signoff Visa-Bulletin**

The Department of State also has available a recorded message with visa cut-off dates which can be heard at: (:
The recording is normally updated by the middle of each month with information on cut-off dates for the following

Readers may submit questions regarding Visa Bulletin related items by E-mail at the following address:

> **VISABULLETIN@STATE.GOV**

(This address cannot be used to subscribe to the Visa Bulletin.)

Department of State Publication 9514
CA/VO:June 12, 2007